Genaro SOROA–GONZALES, Plaintiff,

v.

Benjamin R. CIVILETTI, Secretary of the Department of Justice; Edmund Muskie, Secretary of State Department; Norman A. Carlson, Director, Bureau of Prisons; Jack Hanberry, Warden, United States Penitentiary; and Tyrus E. Minnix, District Director of Immigration and Naturalization Service, Defendants.

Civ. A. No. C80–1356A.

United States District Court,
N. D. Georgia,
Atlanta Division.

May 21, 1981.

Supplemental Order June 4, 1981.

Deborah Ebel and Barbara Twine, Atlanta Legal Aid Society, Atlanta, Ga., for plaintiff.

Douglas Roberto, Asst. U. S. Atty., Atlanta, Ga., for defendants.

## ORDER

SHOOB, District Judge.

Is it fair or reasonable for the President of the United States to invite refugees from Cuban oppression to this country and then detain one of them *indefinitely* in a maximum security federal prison on the sole ground that he, like 130,000 other Cuban refugees who are now free on parole, arrived without proper entry papers? The answer is *no*. It is neither fair, reasonable nor humane. Can this Court do anything about it? This Court concludes that it can.

Petitioner, presently incarcerated at the Atlanta Federal Penitentiary, is a Cuban refugee who arrived in the United States approximately one year ago as part of the "Freedom Flotilla." He brings this habeas corpus action to challenge the legality of his detention under both domestic and international legal principles. It is unfortunate that petitioner must do so. The problems posed by the sudden arrival of 130,000 Cubans within a short period of time are best dealt with by the other branches of government. But in the absence of action by either the legislative or executive branch,[1]

1. In an effort to avoid intruding into what is essentially a practical problem, this Court asked the Assistant United States Attorney representing respondents to have a review of petitioner's file conducted to determine whether he could be released from prison if a sponsor could be found for him. The response was as follows.

[Officials of the Immigration Service at the Atlanta Penitentiary] have made a preliminary review of [petitioner's] which indicates to them that the individual may be releasable. However, any final authorization to release the individual must come from the central office in Washington. I have requested the individuals at Atlanta to interview the alien and make a recommendation to Washington in regard to his release. I will continue to follow this matter in an attempt to expedite the decision making process as much as possible. I am sorry that I am unable to give the Court a definitive answer at this time but I am sure the Court is aware of the nature of the governmental decision making process.

You also raised certain questions about the review procedure which I outlined to the Court as having been adopted by the Justice Department in an attempt to release as many of the detainees from custody as possible. I must now report to the Court that the review procedure, which I was informed about and which I explained to the Court, is not being implemented at the present time. This review process was recommended by individuals acting for the Carter Administration under Attorney General Civiletti. With the advent of the new Administration and a new Attorney General, the program has been withheld from operation. The Attorney General is currently reviewing the situation and is to receive a report from the Immigration Refugee Task Force on or about May 4, 1981. At that time, he will decide in which direction the Justice Department will go in regard to the release or continued detention of the Cubans. I would expect that some review and release procedure will be adopted but I cannot affirmatively represent this to the Court at this time. I will endeavor to keep the Court apprised of all information provided to me by the Justice Department in this regard. Letter to the Court dated April 9, 1981. (The district judge in *Fernandez v. Wilkinson,* D.C., 505 F.Supp. 787, had the same concerns about intruding into the spheres of the political branches, and experienced the same problems with absence of government policy. 505 F.Supp. at 799.) This letter and reports in the media indicate to the Court (1) that relief for

this Court is required to perform the traditional function of a court petitioned to issue the Great Writ. For the reasons set forth in this order, the Court concludes (1) that it has jurisdiction over this habeas petition, (2) that the district director of the Immigration and Naturalization Service abused his discretion in revoking petitioner's parole and refusing to reinstate parole, and (3) petitioner is entitled to relief. The Court emphasizes that its conclusions are limited to the particular facts before it, the facts concerning Genaro Soroa-Gonzales, the petitioner, and his incarceration. The Court intimates no opinion concerning the legality of detention of the remaining 1,700 Cuban refugees at the Atlanta Federal Penitentiary.

## FACTS

Counsel for the parties arrived at the following ten stipulations of fact concerning petitioner.

### 1.

Genaro Soroa-Gonzales arrived on the shores of the United States of America on May 18, 1980. Soroa-Gonzales came to America as part of the freedom flotilla from Cuba.

### 2.

On May 18, 1980, upon arrival at Key West, Florida, Soroa-Gonzales was granted temporary parole by the Attorney General or his designated agent. Said temporary parole was granted pursuant to 8 U.S.C. § 1182(d)(5).

### 3.

After his initial detention by INS at Key West, Florida, Soroa-Gonzales was transferred to a camp at Fort Indian Town Gap, Pennsylvania. On or about May 22, 1980, Soroa-Gonzales filed his request for political asylum.

petitioner is unlikely in the near future; and (2) that it will be quite some time before the other branches of government develop any solution

### 4.

On May 24, 1980, Soroa-Gonzales gave a statement to an INS agent about his activities in Cuba. INS interpreted his statement to be that he was arrested and convicted in Cuba of a serious non-political crime involving drugs.

### 5.

On or about May 28, 1980, Soroa-Gonzales was incarcerated in the Atlanta Federal Penitentiary, and has been and continues to be held there at the behest of respondents.

### 6.

On or about May 29, 1980, INS revoked Soroa-Gonzales' parole status, and on June 11, 1980, advised him that a further inspection and hearing would be conducted pursuant to § 236 of the Immigration and Naturalization Act to determine if he was admissible to the United States. The grounds for the revocation of his parole, and the grounds upon which INS believed Soroa-Gonzales to be excludable were those grounds found at 8 U.S.C. § 1182(a)(23), and (20), to wit: he was an alien who the Immigration officers knew or had reason to believe was an illicit trafficker in narcotic drugs or marijuana; and he was an alien who was not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry documents.

### 7.

On July 15, 1980, an exclusionary hearing was held In The Matter of Soroa-Gonzales to determine whether he was admissible. The Administrative Law Judge found during that hearing that Soroa-Gonzales did not commit any serious non-political crimes (including therein that the government failed to establish that he was a trafficker in illicit drugs). The INS further found that detention should continue because Soroa-Gonzales did not

to the problems presented by the "Freedom Flotilla." In light of this, the Court declines to delay a ruling any further.

have proper entry documents and because there was insufficient evidence to justify political asylum.

### 8.

On July 15, 1980, Soroa-Gonzales appealed, to the Board of Immigration Appeals, the decision rendered by the ALJ. The alien's appeal from an oral decision of an ALJ must be made there and then at the conclusion of the exclusion hearing. 8 C.F.R. § 236.7. The Appeal Form does not require that an alien specify exactly which Findings of Fact or Conclusions of Law are appealed from. Rather, the alien who appeals the decision, is merely requested to briefly state the general reasons for the appeal, which was done in this case. Soroa-Gonzales generally appealed all the unfavorable findings made by the ALJ.

### 9.

A Notice of Appeal was also filed by the INS trial attorney on July 15, 1980.

### 10.

The Board of Immigration Appeals has not rendered any decision on the matters before it.

Stipulations, August 22, 1980. The parties reached additional stipulations to certain general matters. Among them are the following.

All those recent Cuban refugees who have been temporarily paroled into the United States, and who are excludable solely on the basis of lack of proper entry documents, are presently living in camps, and are being processed by INS.

The processing consists of finding sponsors for those Cubans. Once sponsors are found, those Cubans are being released from the camps to the sponsors.

*Id.* Further,

Subsequent to the Petitioner's exclusionary hearings the Immigration and Naturalization Service has refused and continues to refuse to reinstate Petitioners' parole status.

No specific written Order denying Petitioner's readmittance to parole is in existence. However, Immigration and Naturalization Service has in fact refused to reinstate Petitioners' parole, and the original written orders revoking Petitioners' parole remain in full force and effect.

Immigration and Naturalization Service has refused, by written notice dated August 5, 1980, to release Petitioners on bond.

Supplemental Stipulations of Fact, September 25, 1980.[1.5]

### STATEMENT OF THE CASE

This habeas corpus action was filed in forma pauperis on August 6, 1980. All proceedings were conducted before a United States Magistrate until October 16, 1980. On that date, Magistrate Feldman issued his lengthy Report and Recommendation. The Magistrate recommended that the petition be dismissed without prejudice, since the Court lacked jurisdiction to review the district director's revocation of petitioner's parole. This Court declines to adopt the Report and Recommendation and concludes that it has jurisdiction over this habeas

---

**1.5** Petitioner Soroa-Gonzales denies the government's allegations that he was involved in drug trafficking, and claims that he was not in jail in Cuba prior to his trip here to the United States.

The Court takes note of the following assumptions it makes relevant to the government's argument that petitioner is free to leave the United States at any time, either to return to Cuba or to go elsewhere in the world. First, the Cuban government will apparently not take any of these refugees back in the foreseeable future. *See Fernandez v. Wilkinson,* 505 F.Supp. 787, 789 (D.Kan., 1980) (Rogers,

J.). (Petitioner, who justly fears for his safety if he is returned to Cuba, strenuously opposes such a return.) Second, petitioner is unlikely to be able to make arrangements to emigrate and settle elsewhere while his return address is an American penitentiary.

Certain additional facts appear in footnote one of this order; in the body of this order; and, concerning the Cuban "Freedom Flotilla" generally, in the opinions of Judge Rogers in *Moises Garcia Mir v. Wilkinson,* C80–3139 (D.Kan., September 2, 1980) and *Fernandez v. Wilkinson, supra,* and in *Colon v. Carter,* 507 F.Supp. 1026 (D.P.R.1980).

corpus petition and that the stipulations of fact and other facts appearing from the record are sufficiently clear to enable the Court to grant appropriate relief in this case. In doing so, this Court stresses the precise nature of this action: it is a habeas corpus action brought by a person incarcerated to review the legality of his detention. Petitioner is detained by virtue of the revocation of his parole on May 29, 1980 by the District Director of the Immigration and Naturalization Service (INS) and by the District Director's refusal to reinstate petitioner to parole. Petitioner does not in this action challenge the Administrative Law Judge's determination that petitioner is excludable; that decision is not reviewable by a court until the administrative process is completed by a final decision of the Board of Immigration Appeals.[2]

## JURISDICTION

It is clear that there is no specific provision which grants federal district courts the power to review the INS District Director's decision whether or not to grant parole to an alien determined by an ALJ to be excludable. Nor is there any specific provision barring review. The question of this Court's subject matter jurisdiction must be answered by reference to more general provisions. Petitioner argues that at least three general grants of jurisdiction permit this Court to exercise its power over this controversy: 8 U.S.C. § 1329; 28 U.S.C. § 1331; and 28 U.S.C. § 2241. For the reasons set out below, each of these provisions is an adequate jurisdictional basis.

■ A. 8 U.S.C. § 1329 provides as follows.

§ 1329. Jurisdiction of district courts
The district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this title. It shall be the duty of the United States attorney of the proper district to prosecute every such suit when brought by the United States. Notwithstanding any other law, such prosecutions or suits may be instituted at any place in the United States at which the violation may occur or at which the person charged with a violation under section 275 or 276 [8 USCS §§ 1325, 1326] may be apprehended. No suit or proceeding for a violation of any of the provisions of this title shall be settled, compromised, or discontinued without the consent of the court in which it is pending and any such settlement, compromise, or discontinuance shall be entered of record with the reasons therefor.

"This title" refers to Title II of the Act of June 27, 1952, 8 U.S.C. § 1151 *et seq.* The Attorney General's authority (exercised through the INS District Director, *see* 8 C.F.R. § 212.5), to parole aliens into the United States derives from 8 U.S.C. § 1182(d)(5), a part of Title II. Petitioner claims that the Attorney General abused his discretion in revoking and refusing to reinstate parole. On the face of it, the Court has jurisdiction under 8 U.S.C. § 1329.

The Magistrate concluded, on the basis of his review of the legislative history and certain Supreme Court opinions, that Congress intended that district courts lack jurisdiction to review anything but the final determination that the alien is excludable. However, what Congress was actually doing when it passed the legislation cited by the Magistrate was to provide (1) that administrative appeals be exhausted before the final excludability determination could be challenged in court; and (2) that habeas corpus actions, and not actions under the Declaratory Judgment Act, or any other

---

2. *But see In re Castellon-Pichs*, File # A24 436 419-Atlanta, Board of Immigration Appeals, February 2, 1981. (Castellon-Pichs also filed a habeas action which was a companion case to the instant one. *German Andres Castellon-Pichs v. Civiletti*, C80–1355A. That case was dismissed as moot when petitioner was released on parole.) The fate of Castellon-Pichs' administrative appeal bodes ill for petitioner Soroa-Gonzales. The administrative Law Judge determined, despite the government's assertions to the contrary, that Castellon-Pichs was *not* excludable as an alien convicted of a crime involving moral turpitude; the ALJ found that he *was* excludable as an alien lacking proper entry papers. The Board of Immigration Appeals, over a strong dissent, affirmed as to both determinations.

provision, be the vehicle for review of the final administrative determination that the alien is excludable. Clearly, Congress did not foresee the instant situation at all, where it now takes the Attorney General in excess of a year from landing to make the final excludability determination and where, in the meantime, it is the District Director's simple discretionary denial of parole which effectively incarcerates petitioner in a maximum security prison—solely because, like all 130,000 recent Cuban refugees, he lacks his entry papers.

This Court is familiar with the language in *Knauff v. Shaughnessy*, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950), and *Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), cited by the Magistrate and the government.[3] The Court is likewise well aware that it ought to be reluctant to overturn executive decisions related in any way to immigration. *See Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977). But in light of the apparent conferral of jurisdiction under 8 U.S.C. § 1329, the presumption of judicial reviewability of final[4] administrative decisions,[5] and the petitioner's presence here in response to an invitation from our Chief Executive and in flight from a repressive regime, the Court concludes that it is appropriate to exercise its jurisdiction pursuant to 8 U.S.C. § 1329.

▪ B. 28 U.S.C. § 1331 provides:

§ 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

The Magistrate concluded this provision and 8 U.S.C. § 1329 "are virtually identical as to federal questions arising under Subchapter II of the immigration laws: any action reviewable under [8 U.S.C. § 1329] is also reviewable under 28 U.S.C. § 1331." Magistrate's Report and Recommendation, page 21. In light of the Court's conclusion that jurisdiction exists under 8 U.S.C. § 1329, jurisdiction also exists under the federal question provision. *See Chen Chaun-Fa v. Kiley*, 459 F.Supp. 762, 765 (S.D.N.Y.1978).

▪ C. Finally, 28 U.S.C. § 2241 provides, in pertinent part:

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. . . .

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; . . .

There is no question that petitioner is in custody under the authority of the United

---

**3.** "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff, supra*, 338 U.S. at 544, 70 S.Ct. at 313. *Knauff* and *Mezei*, however, both involved final excludability determinations in cases where national security concerns were at issue. Here, on the contrary, petitioner asks only that the Court review the parole decision; petitioner presents no national security risk, so far as appears from the record; and his presence here is partially in response to former President Carter's invitation. In that last respect, this action bears some relation to *United States ex rel. Paktorovics v. Murff*, 260 F.2d 610 (2d Cir. 1958). In that case, the Second Circuit held that Paktorovics, a Hungarian refugee among the thousands paroled into the United States following the 1956 Hungarian Revolt, could not have his parole revoked without a hearing. The Second Circuit held that petitioner was entitled to contest the discretionary revocation of parole on the merits, in light of the peculiar facts that made the case, until now, *sui generis*.

**4.** The Board of Immigration Appeals does not have the authority to review an INS District Director's parole decisions. *In re Castellon-Pichs, supra*, at 5; *Conceiro v. Marks*, 360 F.Supp. 454, 456–57 (S.D.N.Y.1973).

**5.** *See Knoetze v. United States*, 472 F.Supp. 201, 205 (S.D.Fla.1979).

States.[6] Respondents contend that the District Director's revocation of petitioner's parole is an unreviewable discretionary determination, and that this Court has no jurisdiction over any aspect of respondents' treatment of petitioner until petitioner challenges by a habeas corpus action a final Board of Immigration Appeals decision that petitioner is excludable. But, as the Court has previously indicated, the notion that a decision which has the effect of incarcerating for a year in a maximum security federal prison a human being (despite the fact that he is not legally in the United States) is unreviewable because it is committed to the discretion of the executive branch, is untenable. The government's argument is antithetical to our notions of justice and in utter contradiction of our tradition of the utmost respect for the Great Writ, the writ of habeas corpus ad subjiciendum, which "shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." United States Constitution, Art. I, § 9, cl. 2. *See also Fay v. Noia*, 372 U.S. 391, 399–426, 83 S.Ct. 822, 827–42, 9 L.Ed.2d 837 (1963). The writ "cuts through all forms and goes to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell." *Frank v. Mangum*, 237 U.S. 309, 346, 35 S.Ct. 582, 595, 59 L.Ed. 969 (Holmes, J., dissenting).[7] The Supreme Court recently reiterated that

[our] recent decisions have reasoned from the premise that habeas corpus is not "a static, narrow, formalistic remedy," *Jones v. Cunningham, supra*, [371 U.S. 236] at 243, 83 S.Ct. [373], at 377 [9 L.Ed.2d 285], but one which must retain the "ability to cut through barriers of form and procedural mazes." *Harris v. Nelson*, 394 U.S. 286, 291, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1969). See *Frank v. Mangum*, 237

U.S. 309, 346, 35 S.Ct. 582, 594, 59 L.Ed. 969 (1915) (Holmes, J., dissenting). "The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson, supra*, 394 U.S. at 291, 89 S.Ct. at 1086.

*Hensley v. Municipal Court, San Jose Milpitas Judicial District, Santa Clara County, California*, 411 U.S. 345, 349–50, 93 S.Ct. ... 1571, 1574, 34 L.Ed.2d 79 (1973). See also *Preiser v. Rodriguez*, 411 U.S. 475, 486, 93 S.Ct. 1827, 1834, 36 L.Ed.2d 439 (1973). For the reasons set forth above, this Court concludes that it has the power under 28 U.S.C. § 2241 to adjudicate petitioner's claim that he is being held in violation of the laws of the United States.

The conclusion of this Court that it has jurisdiction to review the legality of petitioner's confinement, and hence, to review the District Director's parole decision, is consistent with the leading text on immigration matters and with the case law. See 1 *Gordon and Rosenfield, Immigration Law and Procedure*, § 2.54, page 2–372 ("[T]he award or refusal of parole, the conditions fixed, and the termination of parole obviously involve the exercise of discretion. This discretionary authority is broad, but not unlimited. It may be subjected to judicial scrutiny on a charge that discretion was arbitrarily exercised or withheld."). *And see, e. g., Ahrens v. Rohas*, 292 F.2d 406 (5th Cir. 1951); *United States v. Murff*, 260 F.2d 610 (2d Cir. 1958); *Conceiro v. Marks*, 360 F.Supp. 454 (S.D.N.Y.1973); *Vucinic v. United States Immigration and Naturalization Service*, 243 F.Supp. 113 (D.Ore.1965); and, by implication, *Fernandez v. Wilkinson, supra*. See also *Pierre v. United States*, 547 F.2d 1281 (5th Cir. 1977). *Cf. Nguyen Da Yen v. Kissinger*, 528 F.2d 1194 (9th Cir. 1975) (open question). *But see*

---

**6.** The legal fiction that an excludable alien is "waiting at the border" wears quite thin after a year at the Atlanta Federal Penitentiary.

**7.** "The principles advanced by Mr. Justice Holmes in his dissenting opinion in *Frank* were

later adopted by the Court in *Moore v. Dempsey*, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, and have remained the law." *Fay v. Noia, supra*, 372 U.S. at 412, n. 22, 83 S.Ct. at 834, n. 22.

*Petition of Cahill,* 447 F.2d 1343 (2d Cir. 1971).[8]

## STANDARD OF REVIEW

■ Whatever the standard in other circuits, the standard of review is clear in this circuit: the question is whether the Attorney General, acting through the INS District Director, abused his discretion in revoking and refusing to reinstate parole for petitioner. *Ahrens v. Rojas,*[9] *supra,* 292 F.2d at 411 ("In revoking the plaintiff's parole there was no abuse of discretion on the part of the Attorney General."); *Pierre v. United States, supra,* 547 F.2d at 1289.

## THE MERITS

The basis for the Attorney General's parole authority is found in 8 U.S.C. § 1182(d).

(5) The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(6) The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of excludable aliens applying for temporary admission under this subsection....

The Attorney General has delegated this authority to the various INS District Directors. 8 C.F.R. § 212.5.[9.5]

---

**8.** The *Cahill* court held that its review of parole decisions was limited to ascertaining *that* the Attorney General exercised his parole discretion. This holding is not wholly consistent with *Murff* and *Conceiro,* above, but it should be noted that the Second Circuit ruling came on September 3, 1971, only two days after Cahill flew into the United States. Moreover, the appellate court was careful to limit the holding: "*At this posture of the proceedings before the Immigration and Naturalization Service,* we believe we are without authority to grant parole or bail." *Cahill, supra,* 447 F.2d at 1344 (emphasis added).

And even the standard of review in *Cahill,* deferential as it is, is still a form of judicial review over the parole decision.

**9.** It is true that *Rojas* was an action under the Declaratory Judgment Act, which is no longer available for review of exclusion decisions. 8 U.S.C. § 1105a(b). But the fact that jurisdiction is exercised pursuant to ¹a different provision does not alter the standard of review of the administrative decision.

**9.5** § 212.5 Parole of aliens into the United States.

(a) General. The district director in charge of a port of entry may, prior to examination by an immigration officer, or subsequent to such examination and pending a final determination of admissibility in accordance with sections 235 and 236 of the Act and this chapter, or after a finding of inadmissibility has been made, parole into the United States temporarily in accordance with section 212(d)(5) of the Act any alien applicant for admission at such port of entry under such terms and conditions, including the exaction of a bond on Form I-352, as such officer shall deem appropriate. No alien shall be paroled into the United States under a refugee program or under a claim or [sic] asylum pursuant to Part 108 of this chapter, if he has ordered, assisted or participated in the persecution of any person because of race, religion or political opinion, or if he refuses to make a sworn statement with respect thereto.

(b) Termination of parole. At the expiration of the period of time or upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director in charge of the area in which the alien is located that neither emergency nor public interest warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he shall be restored to the status which he had at the time of parole, and further inspection or hearing shall be conducted under section 235 or 236 of the Act and this chapter, or any order of exclusion and deportation previously entered shall be executed. If the exclusion order cannot be executed by deportation within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director the public interest requires that the alien be continued in custody.

■ The District Director is not required to hold a hearing before revoking parole, *Ahrens v. Rojas, supra*, 292 F.2d at 410, nor did he do so for Soroa-Gonzales.[10] That simply means, however, that the Court's determination whether the District Director abused his discretion must be made on the basis of a less-complete record.

Some general principles as to what may be considered an 'abuse of discretion' in the immigration context may be found in 2 *Gordon and Rosenfield, Immigration Law and Procedure,* § 8–15c. "Allegations that the denial of discretionary relief was arbitrary often are advanced, but seldom supported." *Id.,* at page 8–130 (citation omitted). Discretion is abused if an immigration decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group." *Id.,* citing *Hang v. INS,* 360 F.2d 715, 719 (2d Cir. 1966). Moreover, a person who

> contests a discretionary determination is battling against heavy odds. He generally alleges that there has been an abuse of discretion or that discretion was exercised arbitrarily and capriciously. But the burden is upon him to prove that charge, and he can satisfy this burden only by showing that the order was without reasonable foundation. If the record shows that discretion actually has been exercised, the courts will be reluctant to substitute their discretion for that of the Attorney General. Moreover, administrative officers, like judges, ordinarily cannot be questioned concerning their mental processes in arriving at a decision.

*Id.* at page 8–132 (citations omitted). The reluctance of courts to intervene in discretionary immigration determinations

> is perhaps best illustrated in the decisions. Thus, the courts generally have disregarded allegations that discretionary

relief had been granted in other similar cases, holding that each case must rest on its own bottom.

*Id.* at page 8–133 (citation omitted). Petitioner's burden, then, is extremely heavy. A brief review of the salient facts of record will show that, in this case, petitioner has met his burden.

Petitioner Soroa-Gonzales is one of over 114,000 Cuban refugees who arrived suddenly, and without proper documentation, in South Florida between April 20 and June 20, 1980. *See* Exhibit A to Petitioner's Objections to Magistrate's Report and Recommendation. Petitioner, along with the rest of the Cubans in the "Freedom Flotilla," was temporarily paroled into the country and transferred to a processing camp in Pennsylvania. There, petitioner requested political asylum. He also spoke with a Government Investigator, who received the impression that petitioner had been convicted in Cuba of a drug-related crime. On the basis of the Government Investigator's information, the INS transferred petitioner to the Atlanta Federal Penitentiary on May 28, 1980. The following day his parole was revoked. On June 11, 1980, the INS informed petitioner that a hearing would be held pursuant to § 236 of the Immigration and Nationality Act to determine if he was admissible to the United States, or excludable. The grounds for revocation of parole and for the INS belief that petitioner was excludable were the same: that petitioner was an

> alien who has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana, or who has been convicted of a violation of, or a conspiracy to violate, any law or regulation governing or controlling the taxing, manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, im-

---

10. *But see United States v. Murff, supra.* Were this Court writing on a clean slate, it would adopt the holding in that case that, where petitioner is merely one of thousands "invited here pursuant to the announced foreign policy of the United States as formulated by the President" his parole could not be revoked without a hearing that will assure "that the discretion of the Attorney General shall be exercised against a background of facts fairly contested in the open." *Id.,* 260 F.2d at 614–15.

portation, exportation, or the possession for the purpose of the manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, or exportation of opium, coca leaves, heroin, marihuana, or any salt derivative or preparation of opium or coca leaves, or isonipecaine or any addiction-forming or addiction-sustaining opiate; or any alien who the consular officer or immigration officers know or have reason to believe is or has been an illicit trafficker in any of the aforementioned drugs; . . .

8 U.S.C. § 1182(a)(23); and that petitioner was an immigrant

who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General pursuant to section 211(a)[8 USCS § 1181(a)];
. . .

8 U.S.C. § 1182(a)(20).[11]

At the hearing, the Administrative Law Judge concluded that petitioner was exclud-

able under § 1182(a)(20) for failure to have the proper entry papers. This is hardly surprising; the government was aware that the Cubans in the Freedom Flotilla would be arriving without *any* proper documentation.[12] As for § 1182(a)(23), however, the ALJ found that the applicant denied the allegations and concluded: " . . . I cannot find from the testimony before me that the applicant is or has committed a serious, non-political crime. The Government has failed to submit any further evidence to show this except the respondent did make a signed sworn statement." Thus, the administrative officer charged with making such a decision determined that petitioner was not excludable under § 1182(a)(23) as having committed a drug-related offense. In the Matter of Genaro Soroa-Gonzales, File # A23 182 199 (July 15, 1980) (Transcript of the Oral Decision of the Immigration Judge). Moreover, the Attorney General's own regulations apparently prohibit the INS from appealing the ALJ's determination that petitioner is *not* excludable under § 1182(a)(23).[13]

By letter dated August 5, 1980, the District Director again refused to release petitioner on bond.

---

11. There are 32 categories of excludable aliens under 8 U.S.C. § 1182(a), not counting sub-categories. Among the other categories of excludable aliens are the retarded, § 1182(a)(1); insane persons, § 1182(a)(2); sexual deviates, § 1182(a)(4); drug addicts and alcoholics, § 1182(a)(5); paupers and vagrants, § 1182(a)(8); persons convicted of, or admitting to the essential elements of, a crime involving moral turpitude (other than a purely political offense), § 1182(a)(9); polygamists, § 1182(a)(11); prostitutes and former prostitutes, pimps and former pimps, § 1182(a)(13); persons likely to become public charges, § 1182(a)(15); stowaways, § 1182(a)(18); illiterates, § 1182(a)(25); anarchists and former anarchists, § 1182(a)(28)(A); Communists, § 1182(a)(28)(C); revolutionaries and saboteurs, § 1182(a)(28)(F); and aliens believed by the Attorney General to be entering the country to engage in activities prejudicial to the public interest of the United States, § 1182(a)(27).

12. The Court cannot help but wonder whether, having invited over 100,000 Cuban refugees into the United States without proper entry papers, the government will, over time, provide each of them with an exclusion hearing and attempt to exclude each of them under § 1182(a)(20). Whether the government ought to be estopped by its own conduct from using § 1182(a)(20) as a basis for exclusion of these temporarily paroled Cuban entrants is a question for another day, however. The question for this Court is simpler: whether the District Director abused his discretion in revoking Genaro Soroa-Gonzales' parole.

13. 8 C.F.R. § 236.7(c) provides that the INS District Director

may, within five days from date of decision, appeal from an order of the Immigration Judge to admit the applicant, or to grant asylum, or to grant the application for adjustment.

While the INS apparently filed a cross-appeal in this case from the order finding petitioner excludable under § 1182(a)(20), the oral decision appealed from does none of the things specified in this regulation. The appeals are still pending.

■ Thus, so far as appears from the record, petitioner is being held indefinitely in the penitentiary pending a final exclusion determination and deportation because of his failure to have proper entry papers. It is obvious that the real reason he has been denied parole is the allegation concerning petitioner's involvement with drugs in Cuba, despite the explicit rejection of that allegation by an Administrative Law Judge.[14] A revocation of parole or refusal to reinstate parole is an abuse of discretion if it is "without a rational explanation" or "inexplicably departs from established policies," *supra.*

The rational explanation for revocation of parole, i. e., the suspicion that he had been involved with drugs in Cuba, was weakened to virtually nothing by the Immigration Judge's determination that petitioner was not excludable on that basis.[15] What is more, in a somewhat different context, the Fifth Circuit indicated its disapproval of any consideration of such unproven accusations. *See Sierra-Reyes v. INS,* 585 F.2d 762, 764 n.3 (5th Cir. 1978) (two police reports that implicated petitioner in criminal activity for which he was never prosecuted, considered by immigration judge as "adverse factors" in making determination to deny petitioner discretionary relief from deportation, were "not probative of anything and should not have been considered as 'adverse factors.' "). One court has held that "where the denial of discretionary relief is predicated on several factors, the inclusion of one improper factor may make the entire determination defective," 2 *Gordon and Rosenfield, supra,* § 8–15c, page 8–135, citing *Wang v. INS,* 413 F.2d 286 (9th Cir. 1969).

In sum, there is at present only a glimmer of a rational basis for the District Director's refusal to reinstate parole.

But aside from being contrary to reason, the District Director's revocation of parole and refusal to reinstate parole inexplicably departs from established policies both of parole generally and of treatment of the "Freedom Flotilla" Cubans. The purpose and effect of parole were explained by the Supreme Court in *Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958).

The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted ... Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond. See Annual Reports, Immigration and Naturalization Service, 1955, pp. 5–6; 1956, pp. 5–6. Certainly this policy reflects the humane qualities of an enlightened civilization.

Cited in *Ahrens v. Rojas, supra,* 292 F.2d at 410–11. Petitioner's continued detention pursuant to the INS District Director's parole decisions is inconsistent with the general parole policy.

It is also inconsistent with the government's own statement of policy towards the Freedom Flotilla Cuban refugees.[16] The latest expression of that policy is that "*Criminals* continue to be subject to detention and exclusion or deportation from the United States."[17] Statement of Victor H.

---

**14.** The Court will not even entertain that argument that petitioner's parole could be revoked for his lack of entry papers. Such a determination, in light of the circumstances of the "Freedom Flotilla" and the parole of over 100,000 others known to be lacking such papers, would clearly be an abuse of the parole discretion.

**15.** No other rational basis for petitioner's incarceration is apparent to this Court from the record. Nor have respondents offered any additional reasons for parole revocation during this proceeding. The absence of additional explanation for parole revocation is consistent with the INS' attempt to show petitioner to be

excludable on just two grounds, despite the wide variety of other possibilities listed at note 11, *supra.*

**16.** While it is true that the statement quoted is the Carter Administration policy and that the Reagan Administration's policy may well be different, continued incarceration can not be justified on the ground that government machinery works slowly.

**17.** The Court is aware that the INS has been tremendously burdened by the influx of Cuban and other refugees, and realizes that it is diffi-

Palmieri, "Cuban-Haitian Arrivals in U.S.," U.S. Coordinator for Refugee Affairs, U.S. State Department, June 20, Current Policy No. 193 (Exhibit A to Petitioner's Objections to Magistrate's Report and Recommendation) (emphasis added). An unappealable determination has been made that petitioner is *not* a criminal of the sort alleged by the INS.

Petitioner's continued detention is likewise in apparent violation of the final sentence of 8 C.F.R. § 212.5(b), which requires that an alien, who cannot be excluded by deportation within a "reasonable time," be released on parole unless in the District Director's opinion the public interest requires that the alien be continued in custody. A reasonable time has come and gone, and no public interest in petitioner's detention is apparent other than those public interests which support the continued detention of *all* the Cuban refugees.

Accordingly, this Court concludes that the District Director's refusal to reinstate parole is an abuse of discretion, remediable by this Court.[18]

### RELIEF

Accordingly, the Court having found petitioner's continued confinement to be contrary to law in that the Attorney General abused his discretion in refusing to reinstate petitioner's parole, the writ of habeas corpus shall issue to petitioner under the terms that follow.

cult to marshal evidence concerning the possible criminal activity of aliens in Cuba for exclusionary hearings on such short notice and without assistance from the Cuban authorities. Nonetheless, these considerations, like the difficulties respondents face as acknowledged by the Court in the previous footnote, are insufficient justifications for continuing to imprison this particular alien. This is so even though a U.S. citizen in petitioner's circumstances in Cuba would fare far worse than petitioner. *See The Nereide*, 13 U.S. (9 Cranch) 388, 3 L.Ed. 769 (1815).

**18.** Petitioner did not ask this Court to rule, as did Judge Rogers in *Fernandez v. Wilkinson, supra*, that his detention directly violated international human rights law, but rather asked this Court to look to customary international human rights law for aid in construing domes-

IT IS ORDERED that within ten (10) days from the date of this order respondents shall release the petitioner on parole or within said period SHOW CAUSE in writing directed to this Court, supported by affidavit or other statement, that either

(1) petitioner is a risk to the national security;

(2) petitioner is likely to abscond; or that

(3) for some reason, not readily apparent from the file or from petitioner's circumstances, it would be against the public interest to release the petitioner.

Should respondents come forward with good cause, the case will be set down for an immediate hearing before this Court. If respondents do not come forward with good cause, petitioner shall be released no later than noon on Monday, June 1, 1981.

IT IS SO ORDERED.

### SUPPLEMENTAL ORDER

By order dated May 21, 1981, this Court concluded that petitioner's continued confinement is contrary to law in that the Attorney General, acting through the INS District Director, abused his discretion in refusing to reinstate petitioner Genaro Soroa-Gonzales to parole. The Court ordered petitioner's release on parole no later than Monday, June 1, 1981, unless within that period respondents were able to show cause in writing that

tic legal principles. (There was no need to do so.) There is a substantial question whether an alien in petitioner's position is entitled under U.S. law to invoke international human rights principles to challenge the legality of his detention.

Were the Court forced to decide, however, whether petitioner's continued incarceration pursuant to the INS' refusal to reinstate parole amounted to "arbitrary detention" in violation of the Universal Declaration of Human Rights (Article 9), the International Covenant on Civil and Political Rights (Article 9, para. 1), and the American Convention on Human Rights (Article 7, para. 3), the Court would conclude that petitioner's further detention was arbitrary. He is being treated as if he had been found to have committed a crime in Cuba despite the fact that the opposite was found to be the case.

(1) petitioner is a risk to the national security;

(2) petitioner is likely to abscond; or

(3) for some reason, not readily apparent from the file or from petitioner's circumstances, it would be against the public interest to release the petitioner.

A hearing was held this morning, June 4, 1981, at which argument was had on the sufficiency of the respondents' showing. The Court concludes that no cause exists for petitioner's continued detention, and that further detention is unlawful. Petitioner is no threat to national security; he is unlikely to abscond; and it is not against the public interest to release him. To the contrary, it is against the public interest to continue to confine him.

Accordingly, it is ORDERED that petitioner Genaro Soroa-Gonzales be released on parole by noon tomorrow, June 5, 1981. He shall be released to the custody of Marta and Thomas Antona and shall report to the appropriate INS District Office once a month.

Respondents' motion for a stay pending appeal is DENIED, since

(1) respondents have failed to make a strong showing that they are likely to prevail on the merits of their appeal;

(2) respondents will in no way be harmed if a stay is not granted;

(3) a stay, representing continued incarceration for petitioner, will substantially harm petitioner; and

(4) the public interest will be strongly served by denying a stay of petitioner's release.

IT IS SO ORDERED.